

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:DR/DJM
F. #2025R00508

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 1, 2025

By ECF and E-Mail

The Honorable Peggy Kuo
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Elijah Roy
Docket No. 25-MJ-262 (CHK)

Dear Judge Kuo:

The government respectfully submits this letter in support of its application for the entry of an order of detention pending trial for the defendant charged in the above-referenced case. The defendant, Elijay Roy, also known as "Eli Spice" and "Swervo," is associated with the 5-9 Brims, a violent street gang based in Brooklyn, New York. As alleged in the complaint (the "Complaint"), on August 17, 2025, the defendant engaged in a violent shooting at Taste of the City Lounge in Brooklyn, New York (the "August 17 Shooting" or the "Shooting"). As a result of the Shooting, in which members and associates of the 5-9 Brims and a rival gang, the Folk Nation Gangster Disciples ("GD"), fired over forty shots in a crowded bar, three individuals were murdered and an additional ten individuals were shot and injured.

For the reasons set forth more fully below, including the defendant's brazen and violent conduct, and in light of his criminal history, the defendant is both a flight risk and a danger to the community, and no combination of conditions can secure his appearance at trial and the safety of the community.

I. The Defendant's Crimes

A. Background

The government proffers the following facts concerning the offense conduct that is relevant to the defendant in this case. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government may proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

The 5-9 Brims are one of a number of "sets" of the violent Bloods street gang, which operates nationwide. In particular, the 5-9 Brims are one of several Bloods sets operating within the greater New York City area under the "New York Blood Brim Army" ("NYBBA").[1] The NYBBA acts as ruling body over multiple "Brim" sets, including the 5-9 Brims, Bloodhound Brims, and Mac Balla Brims, among others. The Brims have been responsible for a multitude of crimes across Brooklyn including murder, shootings, stabbings, drug trafficking, robberies and various fraud crimes.

Members and associates of the 5-9 Brims have committed acts of violence on behalf of the gang, such as shootings and other acts involving murder and assault, drug trafficking and fraud, among other crimes. In the 5-9 Brims, participation in criminal activity by a member, especially violence directed at rival gang members, increases the respect accorded to the member and is expected within the gang.

In the present Complaint, the defendant is charged with violent crimes in-aid-of racketeering ("VICAR") in connection with his association with the 5-9 Brims, including assault with a dangerous weapon and assault resulting in serious bodily injury to a member of GD, Jamel Childs, in violation of 18 U.S.C. § 1959(a)(3). In addition, the defendant, who has previously been convicted of a felony offense, is charged with illegally possessing ammunition in connection with the violent shooting discussed herein, in violation of 18 U.S.C. § 922(g)(1).

B. The August 17, 2025 Shooting at Taste of the City Lounge

As set forth in the Complaint and as depicted on video surveillance, the defendant participated in the August 17 Shooting at Taste of the City Lounge, located at 903 Franklin Avenue in Brooklyn, New York (the "Lounge").

Still images taken from video surveillance footage depicts members and associates of both GD and the 5-9 Brims in the vicinity of the Lounge before the August 17 Shooting. For example, at approximately 2:31 a.m., the defendant (circled in yellow below and throughout) joined Marvin St. Louis, an associate of the 5-9 Brims who was killed in the course of the Shooting, and a group of 5-9 Brims associates outside of the Lounge.

[1] The 5-9 Brims operating in the greater New York City region under the NYBBA are distinct from the identically named "5-9 Brims" set of the Bloods street gang located on the west coast of the United States and, primarily, in Los Angeles, California.



As further detailed in the Complaint, and in the video attached to this memorandum as Exhibit A which depicts the shooting in full, at approximately 3:22 a.m., St. Louis, the defendant, as well as others, stood together at the back of the bar, appearing to be in the middle of a discussion. The defendant, St. Louis and another individual then walked back towards the entrance of the Lounge. St. Louis bolted through the crowd toward Childs and the other GD members and associates. St. Louis then began to fire towards Childs and Childs and other GDs returned fire.

The defendant and another individual associated with the 5-9 Brims, who were on their way to the bar's exit when the shooting started and were thereby standing closer to the bar's exit, then proceeded to shoot back towards where Childs and the group of GD associates were standing. A still-image of the defendant firing towards where Childs and the GDs were standing is captured in the second image below.



At approximately 3:23 a.m., the defendant stumbled out of the front door of the Lounge holding a firearm.



In total, St. Louis, Childs, and a third individual were shot and killed as a result of the shooting. An additional ten individuals were shot and injured.

C. The Defendant's Membership in and Association with the 5-9 Brims

As set forth above, the defendant, also known as "Eli Spice" and "Swervo," is associated with the 5-9 Brims. A review of the defendant's social media, including the Facebook account "Eli Spice," indicates that he has publicly displayed photographs and posts showcasing his affiliation with the 5-9 Brims. For instance, the defendant has posted pictures on Facebook of him making hand signs, specifically the "hat" and lowercase "b" hand signs, which are hand signs used by members and associates of 5-9 to signify their association in the gang. For

example, in the below photograph from July 8, 2017, the defendant is making the one-handed "hat" hand sign:



Additionally, posts from the defendant's Facebook account include the phrases "Happy brim day," "Brim love," and "Blooder," which is terminology used by members and associates of the 5-9 Brims to signify their association in the gang. An example is below:




Happy brim day to this lil dirty nigga (Q) Too Much Spice we geeked later
Brim love bro

As described above, on the night of the August 17 Shooting, the defendant was inside and outside the Lounge with multiple members and associates of the 5-9 Brims, which shows his recent affiliation and commission of violent crimes with the gang.

II. <u>The Defendant's Criminal History and Additional Relevant Information</u>

On June 19, 2018, the defendant was arrested for Criminal Possession of a Weapon in the Second Degree: Loaded Firearm, in violation of N.Y. Penal Law § 265.03(1)(b); Criminal Possession of a Weapon in the Second Degree: Loaded Firearm Other Than Person's Home/Business, in violation of N.Y. Penal Law § 265.03(3); Assault in the Second Degree: Intent to Cause Physical Injury with a Weapon/Instrument, in violation of N.Y. Penal Law § 120.05(2); and Reckless Endangerment in the First Degree, in violation of N.Y. Penal Law § 120.25. In full satisfaction of the above charges, on July 15, 2019, the defendant pleaded guilty to Criminal Possession of a Weapon in the Second Degree: Loaded Firearm, in violation

of N.Y. Penal Law § 265.03(1)(b), and Conspiracy in the Second Degree: Intent to Perform a Class A Felony, in violation of N.Y. Penal Law 105.15. He was sentenced to three years' imprisonment and five years' post-release supervision with respect to the firearm conviction and a concurrent 35 to 42 months' imprisonment for the conspiracy conviction.

On June 29, 2023, the defendant was arrested for Misapplication of Property, in violation of N.Y. Penal Law § 165.00(1). On November 20, 2023, a bench warrant was issued for him in connection with this case. While the bench warrant was eventually vacated on August 30, 2024, the government is unaware of the disposition of this case.

On August 27, 2024, the defendant was arrested for Reckless Endangerment in the First Degree, in violation of N.Y. Penal Law § 120.25; Reckless Endangerment in the Second Degree, in violation of N.Y. Penal Law § 120.20; Reckless Driving, in violation of N.Y. V.T.L. § 1212; and Aggravated Unlicensed Operation of a Motor Vehicle in the Third Degree, in violation of N.Y. V.T.L. § 511(1). About a month later, on September 23, 2024, he was then arrested for Forgery in the Second Degree: Public Record, in violation of N.Y. Penal Law § 170.10(2); Forgery in the Third Degree, in violation of N.Y. Penal Law § 170.05; and multiple vehicle infractions. His two cases were consolidated, and on October 25, 2024, the defendant pleaded guilty to Disorderly Conduct, in violation of N.Y. Penal Law § 240.20. He was sentenced to a conditional discharge.

## III. Legal Standard

The court "shall order" a defendant detained if it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

As noted above, the government may proceed by proffer to establish facts relevant to a detention determination. Ferranti, 66 F.3d at 541. Furthermore, "[t]he rules of evidence do not apply in a detention hearing." Id. at 542. As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

IV. Argument

A. The Defendant is Eligible for Detention Under Section 3142(f)

The defendant is charged with a violation of 18 U.S.C. § 922(g), which the Second Circuit has held is a "crime of violence" for purposes of 18 U.S.C. § 3143(f)(1)(A). See United States v. Watkins, 940 F.3d 152, 163 (2d Cir. 2019) ("It has long been the law of our Circuit that possession of a firearm is unequivocally a crime of violence for purposes of § 3142(f)(1)(A). Our Court's reasoning in arriving at this conclusion applies with equal force to the crime of possession of ammunition by a convicted felon.").

The defendant is also facing VICAR charges, including assault with a dangerous weapon and assault resulting in serious bodily injury to a member of a rival gang, in violation of 18 U.S.C. § 1959(a)(3). There is little doubt that this conduct also qualifies as "crime[s] of violence" under the Bail Reform Act. Cf. United States v. Morris, 61 F.4th 311, 320 (2d Cir. 2023) (holding that VICAR assault with a dangerous weapon premised on violations of either N.Y. Penal Law §§ 120.05(2) or 120.10(1) are crimes of violence that can support a conviction under 18 U.S.C. § 924(c)).

B. Detention is Warranted

No bail package will protect the community from the danger posed by the defendant or will mitigate his risk of flight. Each of the four factors set forth in Section 3142(g) militate in favor of his pretrial detention.

First, as noted above, the defendant is charged with crimes of violence and crimes that "involve[] a . . . firearm." 18 U.S.C. § 3142(g)(1). The violent conduct alleged in the Complaint—assault with a dangerous weapon and assault resulting in serious bodily injury, as well the possession of ammunition—involved the defendant firing multiple rounds at rival gang members in a crowded nightclub during the August 17 Shooting. As a result of this incredibly violent and senseless conduct, three people were murdered and an additional ten individuals were shot and injured. This wanton violence demonstrates the severe danger the defendant poses. See United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (holding magistrate judge erred in releasing on bail defendant who possessed a firearm in connection with an allegedly gang-motivated shooting); see also United States v. Destine, No.

20-CR-293 (WFK), 2022 WL 2181453, at *2-3 (E.D.N.Y. June 16, 2022) (finding nature of offense weighed against release for GD member charged with driving a decoy car during a shooting).

Second, the weight of the evidence against the defendant is overwhelming. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) (where the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment) and therefore may present an elevated risk of flight"). As described above, and as seen in the attached video in Exhibit A, law enforcement collected surveillance videos that clearly depicted the defendant in the vicinity of the Lounge and inside the Lounge before the August 17 Shooting. The video footage also captures the defendant and other individuals firing multiple rounds not only at members and associates of GD but in a crowded bar with dozens of people within feet of his intended targets. Immediately after the August 17 Shooting, the defendant ran away from the Lounge with a firearm.

Based on the charges in the Complaint alone, the defendant currently faces a significant maximum potential sentence: 35 years' incarceration. The Shooting, however, is still under investigation, including for charges of discharging a firearm during a crime of violence, which carries a mandatory 10-year sentence, and VICAR murder, which carries a mandatory life sentence. The likelihood of a lengthy term of imprisonment for the defendant gives him a strong incentive to flee and greatly minimizes any risk that pre-trial detention would result in an over-served sentence. See Williams, 2020 WL 4719982, at *2 (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").[2]

That the defendant has an obvious incentive to flee is reflected by his conduct immediately after the Shooting. After the Shooting, which was widely-publicized,[3] the defendant took steps to avoid apprehension. Specifically, he switched cellphone numbers, changed his appearance by shaving his head and fled to New Jersey and then North Carolina, where he was arrested on September 18, 2025 with $7,000 in cash on hand.

Third, the defendant's history and characteristics weigh heavily in favor of detention. The defendant is associated with the 5-9 Brims, a violent street gang. His felony conviction for possessing a loaded firearm, and then subsequent use of a firearm during this shooting, indicates that he was not deterred by his prior custodial term and continues to have and seek access to firearms. The defendant also has a history of failing to appear in court, as

---

[2] See, e.g., United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [defendant's] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee").

[3] See, e.g., Mascarenhas, Lauren, Police searching for multiple shooters who killed 3 and wounded 9 after dispute at a Brooklyn lounge, CNN (Aug. 17, 2025), https://www.cnn.com/2025/08/17/us/brooklyn-lounge-shooting-killed-three-police-searching.

indicated by the bench warrant issued for his arrest in November 2023. This history demonstrates that the defendant poses an unacceptable risk to the community and risk of nonappearance in Court if he were to be released.

Fourth, the risk of further violence and flight by the defendant is severe. Courts have consistently held that where a defendant is associated with a violent criminal organization, no conditions—even stringent conditions of home confinement—are sufficient to protect the community. See United States v. Irizzary, No. 17-CR-283 (LAP), 2020 WL 1705424, at *3 (S.D.N.Y. Apr. 8, 2020) ("Even under normal conditions, electronic monitoring does not suffice to restrain violent criminals who, like [the defendant], are members of organized gangs."); United States v. Choudhry, 941 F. Supp. 2d 347, 359 (E.D.N.Y. 2013) ("It is well established that home detention and electronic monitoring may be insufficient to protect the community against dangerous individuals, particularly where those individuals have the ability to command others to do their bidding."); United States v. Gotti, 219 F. Supp. 2d 296, 299 (E.D.N.Y.) ("In circumstances where the government has demonstrated that a defendant is a leader of an organized crime family, the Second Circuit has uniformly held that the defendant is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."), aff'd sub nom. United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002).[4] The defendant has not been deterred by his prior custodial term or prohibitions based on his conviction and instead not only possessed, but used a firearm in a crowded bar surrounded by dozens of innocent bystanders. The danger this defendant poses to the community is not hypothetical. That risk is real, as evidenced by his and others' actions, which caused three people to die and ten more to be injured.

Accordingly, the § 3142(g) factors each compel detention in this case, demonstrating that the defendant cannot be released without risking the safety of the community and the likelihood that he will not return to court as required. The defendant should therefore be detained.

## V. Conclusion

For the reasons set forth above, the government respectfully submits that no condition or combination of conditions will properly assure the safety of the community or the

---

[4] See also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"); accord United States v. Brennerman, 705 F. App'x 13, 16 (2d Cir. 2017); United States v. Dono, 275 F. App'x 35, 37 (2d Cir. 2008); United States v. Kelly, No. 19-CR-286 (AMD), 2020 WL 2528922, at *3 (E.D.N.Y. May 15, 2020) ("Nor are the defendant's proposed measures—that he be kept on home confinement and monitored by pretrial services—sufficient to eliminate the danger to the community.").

defendant's return to court if the defendant is released on bail, and therefore requests that the Court order that the defendant be detained.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/ Dana Rehnquist
Dana Rehnquist
Daniel J. Marcus
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (CHK) (by ECF)
Counsel of Record (by ECF)